## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DOMINIQUE R. JONES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 11-0012-WS-M** |
| | ) |
| **HORIZON SHIPBUILDING, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 28). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 29-30, 32, 35-37, 39-45, 48, 50, 52), and the motion is ripe for resolution.[1] After carefully considering the foregoing materials, the Court concludes that the defendant's motion is due to be granted in part and denied in part.

## BACKGROUND

The plaintiff, a black female, was employed by the defendant as an aluminum welder from December 2006 to July 2008, when she was fired.

The defendant's president and owner was and is Travis Short. The yard superintendent was Roger Oliver. The plaintiff's immediate supervisors, in chronological order, were John Herrington, Freddie Williams and Tim Sengsiri. The defendant's human resources director was Diane Boutwell. Earnest ("Brad") Wiseman was another welder working with the plaintiff.

---

[1] The defendant's motion to exceed page limitation, (Doc. 49), is **granted**. The parties' motions to strike, (Docs. 54, 56, 58), are resolved by separate order.

The plaintiff asserts the following claims, all brought under Title VII and Section 1981:

Count One (Title VII):  Sex and race discrimination in pay, discipline and termination;

Count Two (Section 1981):  Race discrimination in pay, discipline and termination;[2]

Count Three (Title VII and Section 1981):  Racially and sexually hostile work environment; and

Count Four (Title VII and Section 1981):  Retaliatory discipline and termination.

(Doc. 1).

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id*.  "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id*.; *accord Mullins v. Crowell*, 228

---

[2] Counts One and Two also list discrimination in "subjective decision making policies … and other terms and conditions of employment."  (Doc. 1 at 6-8).  The parties do not mention these forms of discrimination in their briefing, and the Court therefore does not address them.

F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[3]  Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited.  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust*

---

[3] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

*Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

"Both of these statutes [Title VII and Section 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Services, Inc*., 161 F.3d 1318, 1330 (11th Cir. 1998). A plaintiff may establish a violation of Title VII using either direct or circumstantial evidence. *Id*. "When a plaintiff offers circumstantial evidence to prove a Title VII claim, we use the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 … (1973)." *Id*. at 1331.

In cases based on circumstantial evidence, the burden is first on the plaintiff to establish a prima facie case. If she succeeds, the employer must meet its burden of articulating one or more legitimate, nondiscriminatory reasons for the adverse employment action. If it does so, the burden shifts back to the plaintiff to show that the employer's proffered reasons are a pretext for illegal discrimination. *E.g., Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (discrimination); *Sullivan v. National Railroad Passenger Corp*., 170 F.3d 1056, 1059 (11th Cir. 1999) (retaliation).

## I.  Discrimination in Pay.

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." *Cooper v. Southern Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004).[4]  The defendant addresses only the third of these elements.  (Doc. 29 at 12-13; Doc. 48 at 6-7).

---

[4] This Court has doubted whether the fourth listed criterion correctly states controlling Eleventh Circuit law.  *White v. ThyssenKrupp Steel USA, LLC*, 743 F. Supp. 2d 1340, 1350-51 (S.D. Ala. 2010) (the prior panel precedent rule appears to preclude *Coope*r's addition of this (Continued)

According to the plaintiff's affidavit, "I know that I was paid substantially less the [sic] Asian welders hired by Sengsir[i] who started at approximately $22.00 per hour." (Jones Affidavit at 5, ¶ 23). Sengsiri was hired in January 2008 and became a supervisor in May 2008, so the plaintiff's comparators are the Asian-American aluminum welders hired by Sengsiri between his May 2008 promotion and the plaintiff's July 2008 termination. The plaintiff at that time was making $19 an hour. (*Id*.).

The defendant argues the plaintiff's testimony is inadmissible because it contradicts her deposition. (Doc. 48 at 6). The defendant states that, in deposition, the plaintiff "could not identify any employee with [t]he same level of experience as she hired at a higher rate" and did not "know what other people's pay rates were." (*Id*.). In fact, the plaintiff in deposition said that she did know welders hired by Sengsiri that were paid more with less experience, but "I just don't know how to pronounce their names." (Plaintiff's Deposition at 182). Moreover, the plaintiff did not deny knowing these welders' pay *rates*; what she stated was that "I don't know what the other people's pay *raises* were." (*Id*. at 183 (emphasis added)).

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc*., 736 F.2d 656, 657 (11th Cir. 1984). "This rule is applied sparingly because of the harsh effect [it] may have on a party's case." *Allen v. Board of Public Education*, 495 F.3d 1306, 1316 (11th Cir. 2007) (internal quotes omitted). "[T]o allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to

---

element). The question is moot, however, since the defendant has not argued that the plaintiff is unable to show she was qualified to receive the higher wage.

determine which point in time and with which words the ... affiant ... was telling the truth." *Id.* (internal quotes omitted).  Thus, there must be an "inherent inconsistency" between affidavit and deposition before the former may be disregarded as sham.  *Id.*; *accord Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11ᵗʰ Cir. 2010).  Otherwise, "the general rule allowing an affidavit to create a genuine issue even if it conflicts with earlier testimony in the party's deposition ... governs." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11ᵗʰ Cir. 1987) (internal quotes omitted).

The defendant does not address these principles or cite any other authority in support of its position.  The Court concludes that the inconsistencies, if any, between the plaintiff's deposition and her affidavit are insufficient to permit her affidavit to be disregarded as a sham.[5]

The defendant notes that the plaintiff's deposition testimony concerning her comparators' hourly rate was "based on 'talk' in the shipyard."  (Doc. 29 at 14).  But the plaintiff's affidavit does not on its face indicate that her awareness of those rates is based on hearsay, and the defendant does not argue that the affidavit is based on hearsay. Accordingly, it will be considered.[6]

The defendant's final argument is that, in order to be similarly situated, the comparator must be "nearly identical" to the plaintiff, including with respect to years' experience and performance record.  (Doc. 29 at 13).  The Court has thoroughly addressed such a contention in a recent opinion, distinguishing the defendant's cases and rejecting its position.  *White v. ThyssenKrupp Steel USA, Inc.*, 743 F. Supp. 2d 1340, 1344-50 (S.D. Ala. 2010).  The defendant's four-sentence argument, which merely cites

---

[5] Because the plaintiff's affidavit is not a sham, the Court must reject the defendant's corollary argument that the plaintiff "does not state what [s]he was paid, nor assert what other employees were paid, nor cite to testimony in the record."  (Doc. 48 at 7 (internal quotes omitted)).

[6] Other than its sham affidavit argument, the defendant addresses the affidavit only by saying, "the evidence [is] insufficient."  (Doc. 48 at 6).  This is too vague a statement to raise any issue for judicial consideration.

cases addressed in *White* and which does not cite *White* at all, furnishes no grounds to revisit that decision.

Because the defendant has not shown the plaintiff's inability to establish a prima facie case, the Court turns to the second phase of the inquiry.  The defendant offers as its legitimate, non-discriminatory reason that it "paid its welders according to their experience and skill."  (Doc. 29 at 15).

To meet its intermediate burden, the defendant must articulate a reason "legally sufficient" to justify judgment in its favor and must support the articulated reason "through the introduction of admissible evidence."  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981); *accord Walker v. Mortham*, 158 F.3d 1177, 1181 n.8 (11th Cir. 1998) (the defendant "must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision").  The defendant has not met this burden.

To supply the necessary evidence of its legitimate reason for the pay disparity, the defendant relies on Short's affidavit, which states that "[t]he hiring rate for welders at Horizon Shipbuilding depends upon the years of experience of the welder and how well they perform welding tasks in the fields."  (Short Affidavit, ¶ 10).  This is fine as a generality, but it is not specific evidence of why the Asian-Americans hired by Sengsiri from May to July 2008 were paid several dollars an hour more than the plaintiff was being paid at the same time.  In particular, Short does not testify that those employees possessed more skill and/or more experience than the plaintiff and that they were paid more than she on that basis.

Short does say that "the majority of the welders hired by Horizon during 2007 and 2008 had many years of welding experience," (*id*.), but this is not specific evidence that each of the Asian-Americans hired by Sengsiri from May to July 2008 possessed such

experience; it reflects at best only that it is more likely than not that some of them did.[7]
Similarly, he says that the plaintiff "had significantly less welding experience than most
of the other aluminum welders," (*id.*, ¶ 12), but he does not address the welders hired by
Sengsiri in the relevant time period or confirm that they fall within the "most" category.

In its reply brief, the defendant directs the Court to the affidavit of Bridget
Andrews and the exhibits attached thereto. (Doc. 48 at 7 n.2). Her affidavit, however,
does no more than authenticate the attached 223 pages of exhibits, which the defendant
invites the Court to peruse, on its own, to perhaps discover evidence supporting the
defendant's articulated legitimate reason. As discussed above, it is not the Court's
burden to review the record on a litigant's behalf to locate evidence supporting its
position, and the Court declines to do so.

Because the defendant has not demonstrated the plaintiff's inability to establish a
prima facie case of pay discrimination based on race or sex, and because the defendant
has not met its burden of supporting its articulated legitimate reason with specific
evidence regarding its actual motivations, it is not entitled to summary judgment as to
these claims.

## II. Discrimination in Discipline.

The parties do not provide a list of the discipline at issue. By scouring their briefs,
the Court has identified three impositions of discipline: (1) a March 2008 written
reprimand for excessive absences, signed by Williams; (2) a July 7, 2008 written warning
for lack of production, and placement on probation, administered by Short; and (3) a July
11, 2008 verbal discipline for cell phone usage, with a written notice of same in her file,
by Oliver. Because the parties have not provided their own list, the Court deems all three
of these episodes, but only these three episodes, to form the basis of the plaintiff's claim.

---

[7] Short offers a chart of welders and their welding experience at the time of hire, but only
for the irrelevant time period of June 2006 to April 2007. (Short Affidavit, Exhibit D).

"To establish discrimination in discipline, ... a plaintiff must first make out a prima facie case demonstrating: 1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline." *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *accord Rioux v. City of Atlanta*, 520 F.3d 1269, 1275-76 (11th Cir. 2008); *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999). The defendant invokes this formulation, (Doc. 29 at 10), and the plaintiff neither objects nor proposes an alternative. Accordingly, the Court utilizes this version of the prima facie case.

The plaintiff does not engage the prima facie case but skips directly to her asserted evidence of pretext. This will not do. When, as here, the defendant points out the plaintiff's inability to establish a prima facie case for lack of a comparator, and the plaintiff fails to show the existence of such a comparator, the inquiry ends and summary judgment must be entered for the defendant. *E.g., Burke-Fowler v. Orange County*, 447 F.3d 1319, 1325-36 (11th Cir. 2006).

As to the July 11, 2008 discipline imposed by Oliver for cell phone usage, the plaintiff argues she can establish her case by direct evidence and thereby avoid the *McDonnell-Douglas* burden-shifting paradigm altogether. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard*, 161 F.3d at 1330. "If the plaintiff offers direct evidence and the trier of fact accepts that evidence, then the plaintiff has proven discrimination." *Maynard v. Board of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003); *accord Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011).

The plaintiff presents evidence that, in May 2008, Oliver directed Williams to fire the plaintiff and stated, "Women need to be at the house" and "[Jones] doesn't need to be

at a job like this."  (Doc. 35 at 3 (citing Williams Affidavit at 3)).[8]  She also presents

evidence that, when she complained to Oliver about her pay on or about June 11, 2008,

Oliver said, "That's why women shouldn't be at the shipyard, it would be too much

confusion."  (*Id*. (citing Jones Deposition at 196)).

The defendant does not effectively address the plaintiff's direct evidence

argument,[9] and some Eleventh Circuit cases may support her position.[10]  The Court

declines to sort through the jurisprudence on its own.  Accordingly, the defendant is not

entitled to summary judgment on the plaintiff's claim, advanced under a direct evidence

---

[8] The defendant objects that Williams' testimony is inadmissible hearsay.  (Doc. 54 at 8).
Contrary to the defendant's assertion, however, the plaintiff obviously does not offer this
evidence to prove that women really do need to be at the house or that the plaintiff really did not
need to be working at the job she had.

[9] The defendant first states some general propositions without tying them to the plaintiff's
evidence.  (Doc. 48 at 13-14).  It then argues incorrectly that the plaintiff, by making alternative
arguments under a *McDonnell-Douglas* paradigm, "tacitly admits" her direct evidence is
inadequate.  (*Id*. at 14-15).  And it concludes with a discussion of "cat's paw" principles that
have nothing to do with direct evidence.  (*Id*. at 15-16).

[10] *See Merritt v. Dillard Paper Co*., 120 F.3d 1181, 1189-90 (11th Cir. 1997) (collecting
Eleventh Circuit cases finding direct evidence); *see also Burrell v. Board of Trustees*, 125 F.3d
1390, 1394 n.7 (11th Cir. 1997) ("When employers …, without concern for particulars, make
broad, derogatory statements about a gender or a race and, thus, demonstrate a general
discriminatory animus toward that protected group, the scope of that evidence can be as broad as
the broad statements.  These statements – because of their breadth – may obviate the need for
inferences about the speaker's motivation for a wide category of employment decisions ….")
(describing *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990)).

The defendant emphasizes an unpublished opinion indicating that "a biased statement,
separate in time from the employment decision under challenge, is not direct evidence of
discrimination."  (Doc. 48 at 13).  To the extent the defendant suggests the direct evidence must
consist of a statement made simultaneously with the employment decision, such a proposition
appears inconsistent with some of the cases cited in *Merritt*.

theory, of sex discrimination in the imposition of discipline for cell phone usage.  The defendant is entitled to summary judgment as to the balance of the plaintiff's claims for race and/or sex discrimination in the administration of discipline, because she proceeds only on a circumstantial evidence theory but cannot establish a prima facie case.

## III. Discrimination in Termination.

The defendant propounds a formulation of the prima facie case requiring the plaintiff to show the existence of a similarly situated comparator treated more favorably. (Doc. 29 at 10).  Because this is a permissible version of the prima facie case, and because the plaintiff neither objects nor proposes an alternative, the Court utilizes this version. The plaintiff identifies no comparator but again repairs to a direct evidence methodology.  (Doc. 35 at 4).

The decision to terminate was made by Sengsiri.[11]  For purposes of her sex discrimination claim, the plaintiff asserts she heard Sengsiri say, "See, that's what women [are] supposed to do.  They are supposed to cook, be in the kitchen, not out here on the shipyard." (Jones Deposition at 130).  As noted, the defendant does not address the plaintiff's proposed direct evidence.  Again, the Court will not on its own analyze the law to determine whether this testimony can be considered as direct evidence that Sengsiri fired the plaintiff because of her gender.

As to her race discrimination claim, the plaintiff asserts that Sengsiri frequently made racial slurs and that he repeatedly expressed an intent to replace black (and some

---

[11] Sengsiri signed the termination notice and delivered it to the plaintiff.  (Doc. 42, Exhibit 21; Herrington Deposition at 55).  The defendant says that "the decision to terminate Jones was made by Sengsiri and Herrington," (Doc. 29 at 5), but the evidence it cites does not support the proposition.  According to Herrington, Sengsiri asked Herrington to write up the document because his own handwriting was poor, and he told Herrington what to write. Herrington told Sengsiri, "if it was me I would terminate her," (Herrington Deposition at 54), a statement reflecting that it was not up to Herrington to make the decision but up to Sengsiri. Short admits that "Tim fired her."  (Short Deposition at 116).

white) welders with Asian welders.  (Doc. 35 at 4).  There is evidence to support both propositions.[12]  Once again, the defendant leaves it to the Court to evaluate whether this testimony provides direct evidence that Sengsiri terminated the plaintiff because of her race.  Once again, the Court declines to do so.

Because the defendant has not shown a direct evidence approach to lack viability, it is not entitled to summary judgment as to the plaintiff's claims that she was terminated based on her race and/or sex.

## IV.  Retaliation in Discipline.

"A prima facie case of retaliation under Title VII requires the plaintiff to show that:  (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  The defendant does not challenge the plaintiff's ability to establish a prima facie case.  (Doc. 29 at 17).

The defendant relies for its legitimate, non-retaliatory reasons on the same ones it articulated with respect to the plaintiff's discrimination claims.  (Doc. 29 at 17).  But the defendant articulated no such reasons with respect to the plaintiff's discipline claims, only with respect to her pay and termination claims.  (*Id*. at 15-16).  Thus, no burden shifted to the plaintiff to show the existence of a jury issue as to pretext, and the defendant is not entitled to summary judgment as to these claims.

---

[12] (Jones Deposition at 106, 172; Wiseman Affidavit, ¶¶ 11, 14).  The defendant's efforts to keep Wiseman's affidavit from being considered at all fail, for reasons set forth in a separate order.  The defendant's particularized objection that this portion of Wiseman's testimony is hearsay, (Doc. 56 at 4), fails for the same reason as its similar objection as to Williams' testimony.  *See* note 8, *supra*.

## V. Retaliation in Termination.

Again, the defendant does not contest the plaintiff's ability to establish a prima facie case. (Doc. 29 at 17).  As its legitimate, non-retaliatory reasons for the plaintiff's termination, the defendant lists:  (1) truancy; (2) lack of professionalism; and (3) lack of subservice, (Doc. 29 at 15-16), although it appears that the defendant intended its first reason to read, "excessive absence," not truancy, and its second to read, "lack of productivity," not lack of professionalism.  (*Id*. at 5).  Each of these would be a legally sufficient reason for termination, and there is record evidence, in the form of an interrogatory response, that the defendant was actually motivated by these reasons.  (Doc. 30, Exhibit 9 ("Plaintiff's employment was terminated due to excess absenteeism after written warning and continued low productivity after written warning, combined with insubordination.")).  The question becomes whether the plaintiff has demonstrated the existence of a jury issue as to whether the defendant's articulated reasons are a pretext for unlawful retaliation.

"The inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct" but "were a pretext for [retaliation]."  *Crawford*, 529 F.3d at 976 (internal quotes omitted).  The plaintiff's burden is to "demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action."  *Rioux*, 520 F.3d at 1279.  Of course, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  *Springer v. Convergys Customer Management Group Inc.,* 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original) (internal quotes omitted).  To make this showing, the plaintiff may resort to "all the evidence," *Crawford*, 529 F.3d at 976, including "the evidence establishing the plaintiff's prima facie case and inferences

properly drawn therefrom." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 143 (2000).

"In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc); *accord Cooper*, 390 F.3d at 730 ("[E]ven if [the plaintiff] could discredit one of the reasons [the defendants] offered for not hiring him, it would still not establish pretext, because to do so, [the plaintiff] would have to establish that *each* of [the defendants'] reasons was pretextual.") (emphasis in original).

There is ample evidence that each of the defendant's articulated reasons for firing the plaintiff is a pretext for unlawful retaliation.  First is the defendant's post-termination accretion of additional reasons for firing the plaintiff that appear nowhere in her termination notice. [13]  The substantive portion of that notice reads in its entirety as follows:

> You have been on one extd. [sp?] going on your 3rd day which should
> have taken only one and a half days to weld.  You spend to[o] much
> time walking & talking & loafing[.]  This is your 3rd and final warning.

(Doc. 42, Exhibit 21).  The only basis given the plaintiff for her termination was her lack of productivity.  Absolutely nothing in the termination notice hints at insubordination or absenteeism as a reason for the termination.

On August 14, 2008, the defendant represented to the Alabama Department of Industrial Relations that the only reason the plaintiff was fired was "Lack of Production." (Doc. 42, Exhibit 19).  Thus, a full four weeks after the termination, the defendant still insisted there was but one reason for the discharge.

---

[13] "We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care System, Inc*., 439 F.3d 1286, 1298 (11th Cir. 2006).

On September 3, 2008, in his letter of appeal from an adverse ruling, Short stated that "[t]he subject employee was terminated due to chronic lack of production and absenteeism." (Doc. 42, Exhibit 20). It was thus almost seven weeks after termination before the defendant added absenteeism to the list of reasons for the plaintiff's termination.

On October 17, 2011, the defendant's responses to interrogatories were notarized. As noted, the defendant asserts therein that the plaintiff was also terminated for insubordination. (Doc. 30, Exhibit 9). No earlier assertion that the plaintiff was terminated for insubordination has been pointed out to the Court. Thus, this reason first appeared over three years after her discharge.

Second, Sengsiri terminated the plaintiff in violation of the defendant's standard policy.[14] In particular, the defendant's policy manual specifies that "[a]ll discharges should be approved in advance by the Personnel Director and/or President." (Doc. 42, Exhibit 14). Sengsiri, however, terminated the plaintiff on his own, without seeking input, much less approval, from Boutwell or Short.[15]

Third, Sengsiri has yet to assert that he terminated the plaintiff for absenteeism or insubordination. The interrogatory response and letter noted above were signed, not by Sengsiri, but by Short. But Short, as just noted, had nothing to do with the plaintiff's termination and so could not easily possess firsthand knowledge of Sengsiri's reasons. On the contrary, while he states his interrogatory responses are "true and correct to the best of his information and belief," he also states that they, "subject to inadvertent or undiscovered errors, are based on, and therefore, limited by the records and information

---

[14] "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert*, 439 F.3d at 1299.

[15] The defendant points out that a deviation from policy "does not necessarily suggest" retaliation. (Doc. 48 at 14). Here, however, it is reasonable to infer that Sengsiri violated company policy because he was terminating the plaintiff for an unlawful reason and did not want Boutwell or Short to question his motives or otherwise interfere with his desire to do so.

still in existence, presently recollected and thus far discovered in the course of the preparation of these answers."  (Doc. 30, Exhibit 9 at 3).  This impressive mouthful of qualifiers increases the appearance that Short's assertions as to Sengsiri's reasons for firing the plaintiff are based on post hoc wishful thinking rather than known reality.

Fourth, Sengsiri wrote up a termination notice not just once, but twice (after the plaintiff left with the first one), and in neither did he list absenteeism or insubordination. (Jones Deposition at 185-88).  Perhaps once could be forgetfulness, but twice looks a lot like purposeful omission.

Fifth, the plaintiff missed three days of work July 8-10. (Doc. 48 at 2).  That Sengsiri did not fire the plaintiff upon her return from that absence (her final one) suggests that absenteeism was not the real reason for her termination a week later – especially when Sengsiri did not claim that it was.

Sixth, to the extent the plaintiff may have been insubordinate immediately before Sengsiri terminated her, thereby providing a potential factual basis for terminating her on that basis, Wiseman was much more insubordinate,[16] yet Sengsiri did not terminate or even discipline Wiseman.  Sengsiri's failure to discipline Wiseman for his behavior, contemporaneous with but much more egregious than that of the plaintiff, is evidence that insubordination was not the real reason for the termination.

Seventh, temporal proximity is relevant to show causation at the prima facie case stage, but it may also be used in support of pretext.  *E.g.*, *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1268 (11th Cir. 2008).  On June 23, 2008, Williams gathered several employees, plus Oliver, Short and Sengsiri, to air complaints about Sengsiri.  The plaintiff was there and told the group, in Sengsiri's presence, that he had

---

[16] Less than an hour before the plaintiff's termination, Wiseman confronted Sengsiri about his racial slurs and began cursing him (on two occasions, twenty minutes apart) in front of Wiseman's crew.  (Wiseman Affidavit, ¶ 31).  All the plaintiff did was smile and nod and, when Sengsiri ordered her to stop, say he could not tell her not to smile.  (Jones Deposition at 151-53).

called her a "nigger lesbian bitch." (Williams Affidavit, ¶ 26).[17]  Sengsiri fired her 24

days later.  *Cf. Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298

(11th Cir. 2006) (a gap of two weeks between protected conduct and termination "is

evidence of pretext, though probably insufficient to establish pretext by itself").[18]

Eighth, on the day the plaintiff was fired, Wiseman confronted Sengsiri in the

shop about his racial slurs and remarks, in front of several employees, including the

plaintiff.  Their confrontation escalated until Wiseman cursed Sengsiri, who stormed out.

Twenty minutes later, Sengsiri returned and began berating the plaintiff.  Wiseman

cursed Sengsiri again, and several employees began to laugh.  The plaintiff smiled and

nodded, and when Sengsiri told her to stop or he would fire her, she said he could not tell

her not to smile.  Sengsiri stormed out and returned a few minutes later with the

termination notice.  (Wiseman Affidavit, ¶¶ 31-34; Jones Deposition at 151-53).[19]  A

reasonable inference is that Sengsiri was stung by Wiseman calling him out on his racial

slurs, saw the plaintiff (whom he knew had recently made a public complaint to

management) and lashed out at her in retaliation for doing so.[20]

---

[17] The defendant's assertion that Williams' testimony is hearsay, (Doc. 54 at 8), fails for the familiar reason that the plaintiff does not offer the testimony for the purpose of proving that she is in fact what Sengsiri called her.

[18] At some point, but no earlier than June 9, 2008, Boutwell talked with Sengsiri about the plaintiff's allegation he had called her a stupid lesbian bitch.  (Jones Deposition, Exhibit 12). Since this complaint was made in private to the human resources director while the June 23 complaint was made publicly to the company owner and at least six other employees, it may be that proximity for pretext purposes should be measured from the latter date.  Even if the earliest possible June 9 date is used, the gap from complaint to termination was 38 days, reducing but not eliminating the probative force of the timing.

[19] Once again, the defendant's hearsay objection, (Doc. 56 at 6), is not well taken, for reasons already stated.

[20] That Sengsiri did not also terminate Wiseman for calling him out for his racist comments is not inconsistent with this inference.  Unlike the plaintiff, Wiseman is white and had known Sengsiri for six years.  Wiseman considered Sengsiri his friend, and Sengsiri apparently thought enough of Wiseman to treat him specially, including by exempting Wiseman from his (Continued)

There may well be additional indicia of pretext, but the foregoing list suffices for present purposes.  Against this impressive pile of evidence, the defendant places its assertion that the plaintiff in fact had productivity issues, including on the day she was fired.  There are many problems with the defendant's argument,[21] but without belaboring the point the Court concludes that the defendant's evidence is not so strong as to preclude a reasonable jury from concluding that the defendant's articulated reasons for terminating the plaintiff are a pretext for unlawful retaliation.

Because a genuine factual issue as to pretext is presented, the defendant is not entitled to summary judgment as to the plaintiff's claim of retaliatory termination.

## VI.  Hostile Work Environment.

The fourth element of a claim for sexual harassment is that "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment."  *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).  The defendant argues that the plaintiff cannot satisfy this test.  (Doc. 29 at 18-21).

"Determining whether the harassment was sufficiently severe or pervasive involves both an objective and a subjective component.  [citation omitted]  In determining the objective element, a court looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

_____

plans to fire the original crew.  But once Wiseman began confronting Sengsiri, their friendship began to deteriorate and Sengsiri began to harass Wiseman on the job.  (Wiseman Affidavit, ¶¶ 6, 10, 11, 25).  The defendant's hearsay objections to some of this testimony, (Doc. 56 at 4), fail for familiar reasons.

[21] These include, without limitation, citations to material not actually in the record and to material that is in the record but which does not support the proposition for which it is cited.

an employee's work performance." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (internal quotes omitted).

The first step is to identify the words and conduct at issue. The plaintiff identifies the relevant harassing conduct as Sengsiri's selection of job assignments and his use of reprimands. (Doc. 35 at 29). Such conduct "constitute[s] discrete acts that must be challenged as separate statutory discrimination and retaliation claims [and] cannot be brought under a hostile work environment claim that centers on discriminatory intimidation, ridicule, and insult." *McCann*, 526 F.3d at 1379 (internal quotes omitted). The plaintiff's claim is thus limited to language.

The plaintiff describes the actionable language as consisting of "constant use of racial slurs, threats to hire an Asian crew, and gender specific obscenities which were directed at" her. (Doc. 35 at 28). The Court details below the evidence underlying the plaintiff's claim, beginning with that offered in support of her racial harassment claim.

### A. Racially Hostile Work Environment.

The plaintiff has presented evidence that: (1) one day in May 2008, she overheard Sengsiri call her a "stupid nigger" and that, when she confronted him, he expanded the phrase to "stupid lesbian nigger bitch," (Jones Deposition at 111-13, 131); (2) she was told Sengsiri once called a male employee a "stupid nigger," (*id*. at 173); (3) "Sengsiri would frequently use racial slurs in the workplace referring to African American workers as 'niggers' and/or 'stupid niggers,'" (Jones Affidavit, ¶ 25); and (4) she heard, directly from Sengsiri and others repeating Sengsiri's remarks that he was going to fire black (and some white) employees and replace them with Asians. (Jones Deposition at 106, 127-28).

The defendant objects to the plaintiff's affidavit testimony concerning frequent use of racial slurs, on the grounds it is "a gross exaggeration of the number of incidents of alleged offensive conduct of Sengsiri which Plaintiff described in her deposition." (Doc. 48 at 7). The plaintiff at deposition gave clear answers to unambiguous questions that unquestionably limit her awareness of racial slurs by Sengsiri to the first two items in the

preceding paragraph.  (Jones Deposition at 111-13, 131, 173, 225).  In order to contribute to a hostile environment, the hostile incidents must have been known by the plaintiff during her employment.  *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995).[22]  To the uncertain extent the plaintiff by her affidavit seeks to suggest she was aware during her employment of more than these two specific incidents, her affidavit is a sham under the authorities cited in Part I and must be disregarded.[23]

The plaintiff's remaining evidence is far too tepid to be considered severe or pervasive.  The comments about firing blacks and hiring Asians are relevant to the plaintiff's claim of racially discriminatory termination, *see* Part III, *supra*, but they do not reflect discriminatory "intimidation, ridicule, and insult" and so do not support a hostile work environment claim.  *McCann*, 526 F.3d at 1379.

That leaves the plaintiff to rely solely on three usages of the "N" word.   The term is unquestionably offensive, but it has not been held to be threatening or humiliating.[24]  Two usages occurred within seconds of each other and so count as a single episode.  The other incident also occurred while Sengsiri was a supervisor, so between May and July

---

[22] The *Edwards* Court agreed with the trial court that where "some of the incidents relied upon were not made known to Edwards until after her termination[, they] could not have contributed to her subjective view of a hostile environment."  49 F.3d at 1522.  The same logic must apply to the objective prong of the test, since a reasonable person's perception of a hostile environment could not be based on incidents of which the reasonable person was unaware.  *Accord Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054 at *19 n.60 (S.D. Ala. 2011) ("But the law in this Circuit is clear that a hostile work environment claim can be predicated only on conduct, statements and incidents of which the plaintiff was *actually aware* during his employment.") (emphasis in original).

[23] The plaintiff also relies on affidavits from Williams and Wiseman about comments they heard from various representatives of the defendant, including Sengsiri and Oliver.  Because they contain no representation that the plaintiff was aware of these comments, the affidavits are unhelpful to her case.

[24] *See McCann,* 526 F.3d at 1379 & n.10 (referring to a former employee as a "nigger bitch" is offensive); *Harrington v. Disney Regional Entertainment, Inc.*, 276 Fed. Appx. 863, 876-77 (11th Cir. 2007) (being called "ghetto" and overhearing other employees being described as "monkeys" and "a lazy nigger" were offensive remarks).

2008.  Two episodes ranks very low on the frequency scale.[25]  This is so even when the episodes occur in a two-month period.[26]  The plaintiff offers no evidence that these statements interfered with her work performance.[27]  The plaintiff's claim must be held to rest on circumstances that are not "sufficiently severe or pervasive to alter the terms and conditions of employment."[28]

Because the plaintiff cannot establish the fourth element of her claim of racial harassment, the defendant is entitled to summary judgment as to this claim.

### B.  Sexually Hostile Work Environment.

The plaintiff has evidence that:  (1) Sengsiri once called her a "stupid lesbian nigger bitch," (Jones Deposition at 111-13, 131); and (2) Sengsiri on "several occasions" called her a "dyke."  (Id. at 131; Jones Affidavit at 5, ¶ 26).[29]

---

[25] See Hrobowski v. Worthington Steel Co., 358 F.3d 473, 477 (7th Cir. 2004) (use of the "N" word on one or two occasions constitutes infrequent usage).

[26] The Eleventh Circuit considers an incident a week to be sufficiently frequent to bolster a plaintiff's case but considers an incident every two months to be insufficiently frequent to do so.  Compare Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501, 509 (11th Cir. 2000) (fifteen instances in four months "was not infrequent") with Mendoza v. Borden, Inc., 195 F.3d 1238, 1249 (11th Cir. 1999) (en banc) (five inappropriate instances in eleven months were "far too infrequent" to support a sexual harassment claim) and McCann, 526 F.3d at 1378-79 (four usages of racial terms in over two years were "too sporadic and isolated" to support a racial harassment claim).

[27] She claims that Singseri's "gender specific slurs" interfered with her work performance, (Doc. 35 at 29), but not his racial comments.

[28] See Burkett v. Glickman, 327 F.3d 658, 661-62 (8th Cir. 2003) (occasional use of the "N" word outside the plaintiff's presence did not create a jury issue on racial harassment claim).

[29] The defendant assumes the plaintiff also relies on the statements of Oliver and Sengsiri discussed in Parts II and III.  (Doc. 29 at 19).  But the plaintiff expressly limits her claim to "gender specific obscenities," (Doc. 35 at 28), and these comments cannot possibly be considered obscenities.

As the plaintiff notes, (Doc. 35 at 28-29), "[c]alling a female colleague a 'bitch' is firmly rooted in gender.  It is humiliating and degrading based on sex." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) (en banc).  But it happened only once, and there is no evidence it interfered with the plaintiff's work performance.

The plaintiff has no similar quote concerning "dyke."  The Seventh Circuit considers it sufficiently mild that occasional statements to the plaintiff that she "looked like a dyke" did "not rise to the level of an objectively hostile work environment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009).  "Several" usages of the term spread over seven months remains low on the frequency scale, and again the plaintiff has no evidence it interfered with her work performance.[30]

Under these circumstances, the plaintiff cannot establish the fourth element of her sexual harassment claim, and the defendant is entitled to summary judgment as to that claim.[31]

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is **granted** with respect to the plaintiff's claims under Title VII and Section 1981 for race discrimination in discipline; **granted** with respect to the plaintiff's claim under Title VII for sex discrimination in discipline in connection with the March 13 and July 7 warnings; and **granted** with respect to the plaintiff's claims under Title VII and Section 1981 for

---

[30] The plaintiff claims that Singseri's "gender specific slurs" interfered with her work performance, (Doc. 35 at 29), but the evidence she cites does not remotely support the proposition.

[31] The plaintiff suggests vaguely that, even if she cannot sustain a claim of hostile work environment based on race or on sex, she can combine the two into a claim based on race-plus-sex.  (Doc. 35 at 2-3, 28).  Of course, this is flatly impossible with respect to her Section 1981 claim, since that statute forbids only race discrimination.  Even with respect to her Title VII claim, the plaintiff identifies not a single case ever allowing such a claim, and the Court will not venture so far on only the plaintiff's say-so.  At any rate, given the weakness of her two claims, even a combined claim would not survive summary judgment.

racially and sexually hostile work environment.  The motion for summary judgment is in all other respects **denied**.

DONE and ORDERED this 19th day of October, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE